UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br>  vs.<br><br>JOSE ARMANDO ZAVALA-ZAVALA,<br><br>  Defendant. | Case No.11-CR-5782<br><br>**ORDER DENYING MOTION TO DISMISS INDICTMENT**<br><br>Docket No. 13 |

Defendant Jose Armando Zavala-Zavala was indicted on December 21, 2011 of violations of 8 U.S.C. §1325 and §1326(a). He now moves to dismiss the indictment based on purported flaws in his deportation hearing. For the reasons stated below, the motion is DENIED.

**I. BACKGROUND**

Defendant was arrested in October 2011 near the Calexico port of entry. He admitted that he had no papers allowing him to legally enter the United States. The government's records show that Defendant was deported from the United States to Mexico on September 11, 2006, and that before the 2006 deportation Defendant had been apprehended in the United States and sent back to Mexico twenty-five times.

Defendant's motion is based solely on the alleged failure of the immigration judge ("IJ") to properly inform Defendant of his right to apply for voluntary departure. At the deportation hearing, Defendant admitted the government's allegations. Transcript, U.S. Ex. 6 ("Tr.") at 10. The IJ explained to all defendants that they might be eligible for a remedy that could allow them

to avoid removal such as voluntary departure, asylum, adjustment of status, and cancellation of removal. Tr. at 3. He stated: "If you are eligible for any relief or remedy I will tell you and give you the chance to apply for it." Id.

The IJ asked Defendant whether he was the son of a U.S. citizen, if he had ever had immigration documents, if anyone had ever applied to immigrate him, if he had ever lived in the United States, or if he had family in the U.S. He answered "no" to all of the questions. Tr. at 9-10. He also stated that he was not afraid of persecution in Mexico and that he had never been to jail or prison. Tr. at 11. Soon after, the IJ asked if there was anything else he "ought to know," and Defendant once again said "no." Tr. at 13. Next, the IJ said:

> You do appear to be eligible for voluntary departure, but you had it, well [sic] say functional equivalent, twenty-five times and violated everyone [sic] of them. So I will deny voluntary departure as a matter of discretion. And I'll order you removed to Mexico the country you chose. But you do not have to accept my decision. You can appeal. Do you want to appeal?

Again, Defendant answered "no," even after learning that declining to appeal would mean that the IJ's decision was final. Tr. at 13.

## II. LEGAL STANDARD AND DISCUSSION

To collaterally attack a deportation under §1326(d), a defendant must demonstrate that (1) he exhausted all administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and that (3) the entry of the order was fundamentally unfair. 8 U.S.C. §1326(d). The underlying order will be found fundamentally unfair only if (1) the defendant's due process rights were violated by defects in the deportation proceeding, and (2) he suffered prejudice as a result of those defects. United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1048 (9th Cir. 2004). Defendant argues that he meets this standard because the IJ failed to allow him to apply for voluntary departure.

Ninth Circuit case law makes clear that defendants in immigration proceedings have due process rights to receive information concerning the right to apply for voluntary departure. United States v. Melendez-Castro, 671 F.3d 950 (9th Cir. 2012).  The Melendez-Castro court explained that "[t]he Due Process Clause of the Fifth Amendment requires that an alien in immigration proceedings be 'made aware that he has a right to seek relief.'" Id. at 954 (citations omitted).

**A. Due Process Violation**

Because the existence of a due process right has been established, the court must determine whether Defendant's due process rights were violated by the IJ.  Melendez-Castro stated that the due process right in this situation "includes providing an alien with the opportunity to apply for relief.  An alien applying for such relief has a right to present evidence in support of the claim." Id.  Defendant argues that because the IJ failed to advise him of his right and thus did not give him the opportunity to support his claim with evidence, his rights were violated.

In support, Defendant points to the facts of Melendez-Castro.   In that case, the defendant faced prosecution under 8 U.S.C. § 1326 after having been deported.  During the deportation hearing, the IJ only summarily explained voluntary departure and stated that he would not grant it to the defendant because he had a personal policy against granting voluntary departure to anyone convicted of a crime in the United States.  Based on this, the court found that Melendez-Castro "never had a genuine opportunity to apply for voluntary departure or present evidence of the factors favoring this relief." Id.

Similarly, Defendant in this case had no opportunity to apply for voluntary departure or present evidence of factors favoring relief.  While the IJ explained that voluntary departure relief exists, he did not explain in detail the consequences of being granted voluntary departure, instead merely stating to all defendants simultaneously that all of the forms of relief "would allow you to

avoid being removed." Tr. at 3.  And while the IJ appeared to consider whether to grant voluntary departure to Defendant, he did not clearly inform Defendant of how he might apply for the discretionary relief or present evidence in his favor.  Instead, he asked him a line of questions (presumably in order to help make the voluntary departure decision), and then stated that the relief would be denied.  While the IJ in this case may have considered more factors than the IJ in Melendez-Castro, he nevertheless failed to give Defendant a meaningful opportunity to apply for the relief or present evidence.   Like Melendez-Castro, Defendant here "would have been discouraged from applying for voluntary departure to an extent that it is as if he was told that he did not qualify for relief." 671 F.3d at 954.  Further, the "IJ never asked [Defendant] whether he wanted to apply and, instead, said that any such application would be futile." Id.

The United States attempts to distinguish Melendez-Castro in several ways.  First, it states that instead of summarily discussing voluntary departure, the IJ here "informed the group about the various forms of relief, including voluntary departure."  It is unclear how the government believes that the IJ here provided more information than Melendez-Castro—he merely stated that there were various forms of relief, listed them, and then told the group that he would inform them if they were eligible for any form of relief and give them the chance to apply for it.  Tr. at 3.  It is true that when speaking with a different defendant, the IJ stated that he would "weigh all the good against all the bad to determine whether to grant voluntary departure." Tr. at 8.  However, the government has not attempted to explain why Defendant should be bound by a statement made to another defendant at the removal proceeding.  It also provides no reason as to why simply announcing that voluntary departure requires weighing good against bad is a sufficient explanation.

Second, the United States maintains that "the IJ in this case did give Defendant an opportunity to apply for voluntary departure by asking" questions relevant to whether discretionary voluntary departure should be granted.  U.S. Opp. at 10.  The government then

4

points out that "[i]t was <u>after</u> these questions were answered that the IJ told Defendant that he appeared eligible for voluntary departure," (emphasis in original) but denied relief because of the twenty-five incidents in which Defendant had been found in the United States.  This argument is unpersuasive.  While the questions asked by the IJ may demonstrate that he considered some appropriate factors for the voluntary departure analysis, it does not change the fact that the IJ never provided Defendant with an opportunity to apply for relief or present evidence or argument on his behalf.  And contrary to the government's implication, the fact that the IJ only told Defendant about his eligibility for voluntary departure <u>after</u> he asked the set of questions makes it <u>more</u> likely that Defendant was unaware that the questions were being asked in order to determine eligibility for voluntary departure.  Because he lacked that awareness, he was likely to be unprepared to answer the questions in a manner that would assist him with securing voluntary departure.

**B. Prejudice**

To succeed, Defendant also must show that he was prejudiced by the due process failure.  To demonstrate prejudice, he "does not have to show that he actually would have been granted relief," only "that he had a 'plausible' ground for relief from deportation."  <u>United States v. Ubaldo-Figueroa</u>, 364 F.3d 1042, 1050 (9th Cir. 2004).  The United States attempts to show that because the equities were not in Defendant's favor, it was impossible that the IJ would have granted him voluntary departure.  The BIA has instructed IJs to consider:

> the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent resident, [as well as positive factors such as] long residence here, close family ties in the United States, or humanitarian needs.

<u>In re Arguelles-Campos</u>, 22 I&N Dec. 811, 817 (BIA 1999).

Defendant fails to demonstrate that relief was plausible. He has violated United States immigration laws on at least twenty-five occasions, willfully ignoring warnings to stop crossing the border illegally.[1] This weighs heavily against him, and he does not have sufficient positive equities to outweigh these violations. He has not shown lengthy residence in the United States, probably because he has so often been forced to return to Mexico. While he now mentions that he has brothers in Stockton, California, he previously stated that his entire family was in Mexico, demonstrating that any family ties he has in the United States are limited. Further, while his financial support for his daughter is undoubtedly important, it represents a typical circumstance for those illegally crossing the border and is simply not enough to outweigh his repeated illegal border crossings.

### III. CONCLUSION

As explained above, the court finds that Defendant's due process rights were violated, but he was not prejudiced thereby. Consequently, the motion to dismiss the indictment is DENIED.

**IT IS SO ORDERED.**

DATED: June 1, 2012

Jeffrey T. Miller
United States District Judge

---

[1] The government points to several cases in which IJs refused to grant voluntary departure in large part because of repeated illegal entries into the United States. While these do not conclusively show that relief would have been implausible, they provide some support for the United States' argument. In Arguelles-Campos, 22 I&N Dec. at 819, the BIA upheld an IJ's decision denying relief for an alien that "entered this country five times without inspection after being permitted to voluntarily depart five times" and drove in the United States without a license, even though he lived with two U.S. citizen children, volunteered at his church, and had no criminal convictions. In In re Teofilo Lopez-Corona, 2008 WL 2782957 (BIA 2008) (unpublished decision), the BIA upheld an IJ decision denying voluntary departure seemingly solely because the defendant had been allowed to voluntarily return to Mexico six times before his hearing.